[No. 10612.  Department Two.  April 16, 1913.]

NATIONAL REALTY COMPANY, *Plaintiff and Respondent*, v.
JAMES NEILSON, *Defendant and Appellant*, PIONEER
FIRE INSURANCE COMPANY *et al., Defendants
and Respondents.*[1]

CORPORATIONS—STOCK — SUBSCRIPTIONS—CANCELLATION.  With the
unanimous consent of all the subscribers, a subscription to the cap-
ital stock of a corporation may be cancelled when the rights of
creditors are not involved, and this may be done without an express
or formal contract; hence a subsequent issue would not be an over-
issue.

SAME—LIABILITY OF SUBSCRIBER—DEFENSES.  Where the rights of
creditors are involved, it is not a defense to an action on an unpaid
subscription that all of the stock of the company had not been sub-
scribed.

SAME—STOCK SUBSCRIPTIONS—INSOLVENCY—RIGHTS OF CREDITORS
AND STOCKHOLDER.  Where a subscription contract called for $150
per share for stock of the par value of $100, and a subscriber gave
his note for the full amount, which was exchanged for bonds that
became assets of the company, the subscriber is not entitled, as
against creditors, to recover from the receiver the difference be-
tween the par value of the stock and the amount paid; since the
rights of creditors are superior to those of stockholders.

Appeal from a judgment of the superior court for Pierce
county, Clifford, J., entered April 26, 1912, in favor of cer-
tain defendants, notwithstanding the verdict of a jury ren-
dered in favor of the defendant and cross-complainant, in an
action on a promissory note.  Affirmed.

*W. W. Zent, J. W. McBurney*, and *Wm. O'Conner (J. E.
McAndrew*, of counsel), for appellant.

*Burkey, O'Brien & Burkey*, for respondents Pioneer Fire
Insurance Co. *et al.*

MAIN, J.—The plaintiff, the National Realty Company, a
corporation, instituted this action for the purpose of recover-

[1]Reported in 131 Pac. 446.

ing upon a promissory note. The defendant Joseph Johns, as receiver for the Pioneer Fire Insurance Company, a corporation, answered by general denial. The defendant James Neilson filed an answer and cross-complaint. To avoid confusion, the parties will be referred to by their respective individual designations. The Pioneer Fire Insurance Company was organized during the month of May, 1909, with a capital stock of $1,000,000, divided into 10,000 shares of the par value of $100 per share. On May 24, 1909, the total amount of capital stock was subscribed for as follows: J. H. Bridgeford and John D. Atkinson each, 150 shares; Will Atkinson, 4,700 shares, and Frank Leison, 5,000 shares. On this date there was charged upon the stock ledger of the company to each of the subscribers the amount of their respective subscriptions. A few days later, and on June 1, 1909, by unanimous consent of all the subscribers, and before any business had been transacted or obligations incurred, the stock was surrendered to the company, except that retained as follows: J. H. Bridgeford and John D. Atkinson each, twenty shares, and Will Atkinson for himself, Frank Leison and associates, 933 shares; and on this date each subscriber was given credit upon the stock ledger for the number of shares attempted to be surrendered by him to the company. There was an agreement that the amount retained should be paid for at $150 per share, $100 for the par value of the stock, and $50 for the surplus fund. The original subscribers at all times regarded their subscription agreement of May 24 as a mere formality. As shown by the evidence, it was not expected by them that any of the stock then subscribed would be paid for. The fact is no stock was issued under the original subscription agreement, and the subscription was considered as not binding, and the stock was to be sold just the same as though no subscription had been made. Subsequent to June 1, 1909, solicitors were sent out to obtain subscriptions to the capital stock of the company, and on January 19, 1910, the defendant Neilson

subscribed for ninety-five shares, by agreement in terms as
follows:

"Pioneer Fire Insurance Company.
"No. 71               Stock Subscription      Par value $100
"Shares 95.  Subscription Price $150 per share.

"I, the undersigned, hereby subscribe for 95 shares of the
capital stock of the Pioneer Fire Insurance Company, of Ta-
coma, Washington, and I promise to pay for the same at the
rate of one hundred and fifty ($150) dollars per share, which
shall apply as follows:  $100 per share on stock, and $50 per
share for the surplus fund of said Company.

"(signed)  James Neilson,
"Dated this 19th day of Jan. 1910. P. O. Address Lind, Wash.

"Received this 19th day of Jan. 1910, on the above sub-
scription seventy-five dollars per share to apply as follows:
$50.00 per share on stock, and $25.00 per share on surplus
fund.               Pioneer Fire Insurance Company.
"By Geo. N. Marsh."

Prior to this time, he had subscribed for five shares, which
had been issued and delivered to him and upon which he had
paid $75, $25 of which was to go to the surplus fund. It will
be noticed that the subscription agreement contains an ex-
press promise to pay $150 per share, $100 on the stock, and
$50 for the surplus fund.  It was believed by the directors of
the Pioneer Fire Insurance Company that $75 per share
would be sufficient to maintain the company and make it a
going concern.  Indeed, when Neilson subscribed, it was rep-
resented to him by one Marsh, then the vice president of the
company, that the sum of $75 per share would be all that
would be required to be paid in upon the agreement. Payment
of $75 per share upon the ninety-five share subscription was
made by Neilson by delivering to the company certain securi-
ties.  Subsequently these securities were returned to him and
he gave his promissory notes for the amount, the final pay-
ment on which was made to the company on October 27, 1910.
Prior to this date, however, the board of directors of the in-
surance company, finding the financial condition of the com-
pany was involved, and that it would be necessary to collect

not only the $75 per share, but the full $150 per share upon the stock subscriptions, on August 18, 1910, made a call upon all the stockholders for such balance, and on September 27, 1910, Neilson was notified in writing of such call, and demand for payment made. Then followed a somewhat lengthy correspondence between Neilson and Bridgeford, the secretary of the company. Neilson desired that fifty shares of stock be issued and delivered to him as fully paid for the $7,500 which the company had received from him, and that his subscription for the remaining fifty shares be cancelled. Bridgeford, from time to time, assured him that the directors doubtless would be willing to do this, but finally wrote that the company had concluded that it could not legally cancel a subscription on account of the then existing rights of the creditors of the company. Thereafter and on December 16, 1910, Neilson delivered his promissory note for the sum of $7,500, payable to the order of the Pioneer Fire Insurance Company, due one year after date, in payment of the balance due upon the entire subscription. A letter urging the giving of this note contained the assurance that, if Neilson was unable to pay the whole amount when it became due, there would be no doubt but that a portion of it could be extended to a more convenient date.

Subsequently the company, finding itself in great financial embarrassment, and being threatened with a revocation of its license by the state insurance commissioner unless it could show an unimpaired capital sufficient to meet the requirements of the law, constituted one J. B. Askew its fiscal agent for the purpose of making some arrangements with the different subscribers whereby assets acceptable to the insurance commissioner could be produced. S. S. Askew, as a representative of J. B. Askew, met Neilson in Spokane on December 16, 1912, and there obtained from him a new note, payable to his own [Neilson's] order, and indorsed on the back by Neilson. Neilson, at the same time and place, indorsed in blank the certificate of stock for ninety-five shares in the Pioneer Fire

Insurance Company, and thereupon delivered both the note and stock certificate to S. S. Askew, the old note being destroyed. This note and stock certificate were returned to J. S. Askew, who exchanged the note to the National Realty Company for bonds in that company, depositing the certificate of stock with the realty company as security for the payment of the note, and delivered the bonds to the Pioneer Fire Insurance Company. On March 20, 1911, the insurance company, being unable to pay its debts or longer continue in business, went into the hands of a receiver, it being indebted in an amount exceeding its assets, including all unpaid stock subscriptions. No certificates of stock were ever issued to the original subscribers, except for the limited number taken by them at $150 per share. All of the stock subscribed, subsequent to what has been mentioned as the original formal subscription, was subscribed for on the same basis as appellant subscribed for his stock.

Neilson, in his answer and cross-complaint, denied liability upon the note, and pleaded affirmatively that, if he should be held liable on the note, then he was entitled to a judgment against the Pioneer Insurance Company for an amount equivalent to any judgment that might be obtained against him on the note by the National Realty Company. The cause was tried to the court and a jury. The jury returned a verdict in favor of the National Realty Company and against Neilson on the note, and a verdict for a like sum in favor of Neilson and against the Pioneer Insurance Company. In due time a motion for judgment notwithstanding the verdict was made by the Pioneer Insurance Company. This motion being granted, Neilson appeals therefrom.

From the facts stated, the first question to be determined is whether or not Neilson's subscription for ninety-five shares constituted an oversubscription to the capital stock of the Pioneer Insurance Company. It will be remembered that the total amount of the capital stock was subscribed for on May 24, 1909, and a few days later, and before any business had

been transacted by the company or rights of creditors arose, by mutual consent of all the then subscribers, the contract of subscription was considered abandoned. If this attempted cancellation were invalid, then it is clear that Neilson's contract called for an overissue. The right to cancel a subscription contract for capital stock, by unanimous consent of all the subscribers, when rights of creditors are not involved, is well settled. Helliwell, Stocks and Stockholders, § 86; *Pacific Fruit Co. v. Coon,* 107 Cal. 447, 40 Pac. 542; *Shelby County R. Co. v. Crow,* 137 Mo. App. 461, 119 S. W. 435; *Scottish Security Co.'s Receiver v. Starks,* 117 Ky. 609, 78 S. W. 455. In the text of Helliwell, *supra,* the author states the law thus:

"In considering the question of the validity of an attempted release of a subscriber by the corporation, distinction must be drawn between the cases which involve the rights of creditors and those which involve the rights of the corporation and its members only. Where the rights of creditors are not involved, the corporation, acting with the unanimous consent of its members, enjoys the right to enter into contract with respect to its shares on whatever terms it may deem to be to its advantage. It may therefore permit a member to withdraw absolutely, canceling all claims against him for unpaid portions of the subscription price of his shares, and this, too, although no other person is substituted in his stead. As indicated, however, to such action on the part of the corporation, the consent of the other stockholders must be unanimous."

In order to effect a cancellation or abandonment of a subscription contract, it is not necessary that the agreement to cancel be express or formal. 1 Cook, Corporations (6th ed.), § 169. Under these authorities, the attempted cancellation or abandonment was valid, and it follows that the subscription of Neilson was not for an overissue of stock. It was a binding and valid contract of subscription.

It is next contended that, if the original subscription were cancelled, then the total amount of the capital stock had never been subscribed for, and for that reason Neilson was en-

titled to a judgment against the insurance company for a sum equal in amount to the judgment against him in favor of the National Realty Company. Many of the cases cited in support of this position are cases where the action was brought by the corporation itself upon the contract of subscription and no rights of creditors were involved. The case of *Denny Hotel Co. v. Schram*, 6 Wash. 134, 32 Pac. 1002, 36 Am. St. 130, is in accord with the other cases cited. It was there held that a corporation could not enforce subscriptions to its capital stock until the full amount of the capital stock had been subscribed for. But where the rights of creditors are involved, a different rule prevails. In the case of *Cox v. Dickie*, 48 Wash. 264, 93 Pac. 523, it was held that the defense that the stock of the corporation had not been fully subscribed was ineffectual as against the rights of the creditors of the corporation. It was there said:

"The first five of these defenses [one of them being no full subscription to the capital stock of the company] may be considered together. It must be remembered that this is not an action by the corporation to enforce the collection of subscriptions for stock or its contracts with its subscribers, but is an action brought by a receiver, under order of the court, to enforce such subscriptions for the benefit of creditors. As between the corporation itself and the stockholders all these defenses would probably be good, but as between the stockholders and the creditors of the corporation another rule prevails."

It is urged that the cases of *Elderkin v. Peterson*, 8 Wash. 674, 36 Pac. 1089, and *Birge v. Browning*, 11 Wash. 249, 39 Pac. 643, sustain the doctrine of nonliability of the subscriber even as against the rights of creditors unless the full amount of the capital stock had been subscribed; but these cases, in so far as they may not be in harmony with the later case of *Cox v. Dickie*, *supra*, are in effect overruled by that case.

It is finally contended that Neilson is entitled to a judgment against the Pioneer Fire Insurance Company for the dif-

ference between the par value of the stock and the total amount paid. The par value was $100 per share, while the subscription contract called for the payment of $150 per share. The evidence shows that Neilson gave the note here sued upon by the National Realty Company as final and full payment of the obligation incurred by the subscription. The note was, by the fiscal agent of the insurance company, exchanged for bonds in the National Realty Company. These bonds then became a part of the assets of the Pioneer Fire Insurance Company. To give Neilson a judgment for the difference between the par value of the stock and the subscription price would be to permit a stockholder as such to share equally with the creditors in the application of the assets. There can be no question but that the· rights of creditors in the assets of an insolvent corporation are superior to those of the stockholders.

The judgment will be affirmed.

MOUNT, MORRIS, ELLIS, and FULLERTON, JJ., concur.