[No. 11398. Department One. December 5, 1913.]

FRED S. KOM, *Respondent*, v. CODY DETECTIVE AGENCY, INCORPORATED, *Appellant*.[1]

CORPORATIONS—CAPITAL STOCK—SUBSCRIPTIONS—AGREEMENT TO RE-PURCHASE—VALIDITY. A contract whereby a corporation sold part of its capital stock agreeing to repurchase the same if the stockholder should become dissatisfied, is against public policy and void, in view of Rem. & Bal. Code, § 3697, providing that it shall be unlawful for the trustees to make any dividend except from the net profits, nor divide, withdraw, or pay to the stockholders any part of the capital stock, nor to reduce the same except in the manner pre-scribed by law; and it is immaterial that the rights of creditors of the corporation are not involved.

Appeal from a judgment of the superior court for King county, Albertson, J., entered April 7, 1913, in favor of plaintiff, upon sustaining a demurrer to the complaint, in an action on contract. Reversed.

*Aust & Terhune*, for appellant.

*Miller & Lysons*, for respondent.

CHADWICK, J.—Plaintiff purchased a part of the capital stock of the defendant under a contract to repurchase. The material parts of the contract follow:

"This agreement made and entered into on this 10th day of December, A. D. 1912, by and between the Cody Detective Agency, Inc., party of the first part, and Fred S. Kom, party of the second part, Witnesseth: That the said party of the first part is an organized detective agency duly incorporated under the laws of the state of Washington, and doing a general criminal and civil detective business and being duly incorporated for the sum of ten thousand ($10,000) dollars, each share of stock being the amount of twenty-five ($25) dollars, and the said Fred S. Kom being desirous of purchasing a block of stock from the said Cody Detective Agency, Inc., now hereby it is agreed as follows:

"That if at any time in the future the said Fred S. Kom

[1]Reported in 136 Pac. 1155.

wishes to cancel his engagement as an operative with the said Cody Detective Agency, Inc., and wishes to dispose of his share of stocks, which is forty (40) shares at the said price of twenty-five ($25) dollars per share, being one thousand ($1,000) dollars, he does hereby agree to sell the stock back to the Cody Detective Agency, Inc., at the price he paid for same. The said Cody Detective Agency, Inc., agrees to purchase the said stocks at the price received for the same from the said Fred S. Kom, which will terminate this agreement."

Thereafter plaintiff became dissatisfied with his bargain, and demanded repayment of the purchase price. The sum of $250 was paid. Defendant then declined to pay the balance due under the contract, and plaintiff brought this action. Defendant answered, setting up the illegality of the contract, to which a demurrer was sustained, and upon plaintiff's motion, a judgment was entered for the full amount sued for with interest.

There is but one question for us to determine, that is, whether the contract is in contravention of the statute Rem. & Bal. Code, § 3697 (P. C. 405 § 41):

"It shall not be lawful for the trustees to make any dividend except from the net profits arising from the business of the corporation, nor divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company, nor to reduce the capital stock of the company unless in the manner prescribed in this chapter, or the articles of incorporation or by-laws."

It is admitted that the stock issued to plaintiff is a part of the original capital stock, and that the company is solvent. It has been repeatedly held by this court that:

"The obvious purpose of the statute is to make the public records show the amount of the capital stock of a corporation; in other words, to speak the truth. It follows, therefore, that, where the capital stock has not been diminished in compliance with the statute, the original articles of incorporation operate as a continuing representation on behalf of the corporation that its capital stock is unimpaired, and

that the impairment of its capital stock in any other manner is a fraud upon its creditors, both as to the corporation and all others who participate in or profit by such an act." *Union Trust Co. v. Amery*, 67 Wash. 1, 120 Pac. 539.

Other cases sustaining this holding are, *Tait v. Pigott*, 32 Wash. 344, 73 Pac. 364; *Id.*, 38 Wash. 59, 80 Pac. 172; *Jorguson v. Apex Gold Mines Co.*, 74 Wash. 243, 133 Pac. 465; *Barnard Mfg. Co. v. Ralston Milling Co.*, 71 Wash. 659, 129 Pac. 389. The soundness of these decisions is not questioned by plaintiff, but it is said that, inasmuch as it is admitted that the company is solvent and has no creditors, the statute and the authorities cited can have no bearing on the case. The following cases holding that, where the rights of creditors are not involved, such contracts are not *ultra vires*, are relied on: *Browne v. St. Paul Plow Works*, 62 Minn. 90, 64 N. W. 66; *Vent v. Duluth Coffee & Spice Co.*, 64 Minn. 307, 67 N. W. 70; *Fleitmann v. John M. Stone Cotton Mills*, 186 Fed. 466; *New Haven Trust Co. v. Gaffney*, 73 Conn. 480, 47 Atl. 760; *Fremont Carriage Mfg. Co. v. Thomsen*, 65 Neb. 370, 91 N. W. 376; *Iowa Lumber Co. v. Foster*, 49 Iowa 25, 31 Am. Rep. 140; *Porter v. Plymouth Gold Min. Co.*, 29 Mont. 347, 74 Pac. 938, 101 Am. St. 569; *Ophir Consol. Mines Co. v. Brynteson*, 143 Fed. 829; *Wisconsin Lum. Co. v. Green & Western Tel. Co.*, 127 Iowa 350, 101 N. W. 742, 109 Am. St. 387, 69 L. R. A. 968.

In the *Browne* case, the court held that the contract fixed an agreed damage. The principle now under discussion was not considered. In the *Vent* case, the *Wisconsin Lumber Co.* case, the *Fleitmann* case, and the *Fremont Carriage Mfg. Co.* case, it either appeared that there was no prohibitory statute or limitation in the charter, or that there was an express authorization. The *Porter* case and the *Consolidated Mines Co.* case are seemingly in point. The *Porter* case, in our opinion, is not a well reasoned authority. It is written on the assumption that, if the stock is repurchased, it is available for the benefit of creditors or stockholders and may be re-

issued by the corporation. It must be admitted that this reasoning is sustained by some of the cases. ⃰ Clark and Marshall, Private Corporations, § 3475, and cases cited.

In a sense, this is true, but it is not actually so. The surrendered certificate, a mere piece of paper, is in the hands of the corporation, but the money it represents, the fund in which other stockholders and creditors have an interest, is withdrawn, and to that extent the capital stock is actually diminished. To hold otherwise would be to declare that the corporation might do by indirection that which it could not do directly, i. e., reduce the capital stock, or work a practical dissolution of the company. The purpose of the statute might be entirely defeated and the vices suggested in the *Amery* case might go unchallenged. In other words, if we follow the *Porter* case, we would write the statute out of the books.

The reasoning employed in that case is met by the very exhaustive opinion of McSherry, C. J., in the case of *Maryland Trust Co. v. National Mechanics Bank*, 102 Md. 608, 63 Atl. 70. We will not pursue the discussion, but will content ourselves by referring to and adopting the argument of that learned jurist, and by referring to Morawetz on Private Corporations (2d ed.), § 112, wherein it is said:

"A purchase by a corporation of shares of its own stock, in effect, amounts to a withdrawal of the shareholder whose shares are purchased, from membership in the company, and a repayment of his proportionate share of the company's assets. There is no substitution of membership under these circumstances as in case of a purchase and transfer of shares to a third person, but the members of the company and the amount of its capital are actually diminished. Whatever a transaction of this character may be called in legal phraseology, it is clear that it really involves an alteration of the company's constitution, just as the withdrawal of a member of a copartnership, with his proportionate share of the joint funds, involves an alteration of the constitution of copartnership. The amount of the company's assets and the number of its shareholders, are diminished. Every continuing share-

holder is injured by the reduction of the fund contributed for the common venture; and the creditors, who have trusted the company upon the security of the capital originally subscribed, or who are entitled to expect that amount of security, are entitled to complain. It is no answer to say that shares having a market value must be regarded like any other personal property, and that no person is injured if a solvent corporation in good faith purchases shares in itself at their market value, inasmuch as the shares so purchased are property in the hands of the company, and may at any time be reissued or sold. No verbiage can disguise the fact, that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the reissue has taken place. The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement, and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds."

In the *Porter* case, the court followed what many courts have said is the general rule in this country. That is, that the company may purchase its shares in the absence of a prohibitory statute; or, that it may purchase its shares if it is expressly authorized so to do by statute, or that it may purchase its shares if the rights of creditors are not immediately involved. The *Ophir Consol. Mines Co.* case, in the opinion of the writer, does not sustain the right of a company to purchase its shares when its powers are limited by a statute such as we have in this state.

It is the rule in England, almost without qualification, that a company cannot contract for or purchase shares of its own capital stock. Cook, Corporations, § 309. There is great confusion in the American authorities, as will be noted

by reference to the text cited. Our statute is sustained by a sound public policy and a due regard for creditors, present and prospective, and associate stockholders.

In the *Amery* case, the right of subsequent creditors to challenge a contract falling within the statute is admitted. It is assumed, *arguendo*, that there were no creditors at the time the contract was entered into. The court said:

"If the respondent's contention that creditors who became such after the stock has been purchased and retired by the corporation have no redress were to be sustained, the practical result would be that as soon as a corporation was organized and before it had incurred any indebtedness, it could purchase from each of its stockholders one-half or more of his stock, retire the stock, deplete the treasury, and then proceed to make debts and defraud creditors who had a right to rely upon the public records as to the amount of the capital stock, and to extend credit to the corporation upon the faith that it had not impaired its capital by any such unlawful means. We cannot stand sponser for a view which would lead to such mischievous ends."

In the *Jorguson* case, the rights of creditors were not involved. The court held in strict line with the statute that a corporation could not impair its capital stock by the payment of dividends. While it does not appear in the reported decision, we deem it not out of place to say that a very able petition for rehearing was filed in that case urging that, inasmuch as the rights of creditors were not involved, and the controversy being between the individual and the corporation, we should recede from our holding and allow a recovery. We denied the petition for rehearing; so that, when the subsequent history of the *Jorguson* case is understood, it seems to the writer that it is directly in point.

"But whether a corporation be solvent or insolvent, the fund represented by its capital stock must remain inviolate for the protection of its creditors. In the absence of statutory authority in that behalf, a corporation has no legal power to reduce this fund by any formal or voluntary act or contract on its part, to the prejudice of its creditors either

18—76 WASH.

then or thereafter existing, whether by distributing any part of it among the stockholders by way of dividend, or by giving any part of it to one or more stockholders, or by disposing of any part of it in any other manner, except by way of changing its form to meet the exigencies of the corporate business. . . . There are many decisions by the state courts, and some dicta in the opinions of the supreme court, which support the proposition, that a contract of a corporation, not *contra bonos mores* or involving *malum in se* or forbidden by the charter or any other law, and merely beyond the grant of corporate power, can be enforced against the corporation after it has been executed on the part of the plaintiff, notwithstanding the fact that the plaintiff at the time of entering into the contract was aware of the lack of corporate authority. But this doctrine has not been accepted by the supreme court. In *Central Transp. Co. v. Pullman's Palace Car Co.*, 139 U. S. 24, 48, 59, 11 Sup. Ct. 484, the court said:

" 'The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts, and this upon three distinct grounds: the obligation of every one contracting with the corporation, to take notice of the legal limits of its powers; the interest of the stockholders, not to be subjected to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law. . . . A contract of a corporation, which is *ultra vires* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any

right of action upon it.' " *Hamor v. Taylor-Rice Engineering Co.*, 84 Fed. 392, 397.

See, also, *Burke v. Smith*, 16 Wall. 390.

The statute contemplates transactions that may arise in faith of the capital stock, and is broad enough to protect future creditors and also stockholders who are not parties to a prohibited contract. This is suggested but not argued in *Olsen v. Northern Steamship Co.*, 70 Wash. 493, 127 Pac. 112, where we held a similar contract to be divisible. It is there suggested that, if the contract was void, it was so because its performance would be a fraud upon other stockholders as well as upon creditors.

Our statute makes no exceptions, and the logic of our own cases leads us to the imperative conclusion that the absence of present creditors will not vitalize the contract sued on. This court is still committed to the trust fund doctrine as applied to corporations. *Lantz v. Moeller*, ante p. 429, 136 Pac. 687; *Tait v. Pigott*, 32 Wash. 344, 73 Pac. 364. The endorsement of contracts such as the one we have before us would be destructive of that doctrine.

We have discussed this case upon general lines, not because we have doubted the application of the statute, but because of the fact that many of the American courts have been disposed to write an exception into the statute in favor of contracting parties where the rights of present creditors are not involved. We have endeavored to show that the contract is contrary to public policy as well as violative of the letter and spirit of the statute law.

The judgment of the lower court is reversed, and the case is remanded with instructions to dismiss.

CROW, C. J., GOSE, ELLIS, and MAIN, JJ., concur.